FILED
TARRANT COUNTY
12/22/2020 11:16 AM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 153-322365-20 _____

| | | |
|---|---|---|
| **BRANDON WATSON,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **____ JUDICIAL DISTRICT** |
| | § | |
| **SIG SAUER, INC.,** | § | |
| | § | |
| **Defendant.** | § | **TARRANT COUNTY, TEXAS** |

---

### PLAINTIFF'S ORIGINAL PETITION WITH DISCOVERY ATTACHED

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

The Plaintiff, **BRANDON WATSON**, (hereinafter "Plaintiff"), complaining of and about Defendant, **SIG SAUER, INC.,** (hereinafter "SIG" or "SIG SAUER"), and for cause of action show unto the Court the following:

### NATURE OF THE ACTION

1.      This is a lawsuit brought by Plaintiff **BRANDON WATSON** against Defendant **SIG SAUER, INC** for manufacturing, distributing, and selling P320-brand semi-automatic pistols that, due to a defect, can inadvertently discharge a round of ammunition if dropped on the ground or **contacted** in such a way similar to being dropped (a "drop fire").  SIG repeatedly misrepresented and warranted that the P320 pistols were "drop safe," won't fire unless you want [them] to," and are "originally manufactured free of defects in material, workmanship and mechanical function."  SIG's original design and manufacture of the P320 pistol rendered the weapon unreasonably dangerous for its intended uses.

2.      The P320 is a popular and commercially successful pistol.  It is used by law

enforcement agencies all over the country and owned by hundreds of thousands of civilians.  In 2016, the U.S. Army selected the SIG P320 to replace the M9 service pistol as the standard-issue sidearm of U.S. military servicemembers.

3.      SIG has known about the drop fire defect since at least April 20, 2016, when the U.S. Army discovered the defect during its field testing.  In the Army's assessment, a heavy and defective trigger and sear caused the drop fire issue.[1]/ The Army insisted that SIG fix the deficiency by installing a lighter trigger and modified sear.  SIG promptly implemented this fix for the military version of the P320.  However, SIG continued to manufacture defective P320 pistols for the civilian market until late 2017.  Currently, there are believed to be approximately 500,000 defective P320 pistols in circulation in the civilian market.

4.      Pistols should not discharge upon mere impact with the ground.  Drop fires are extremely rare and are abnormal in the firearms industry.  A 2015 study from the U.S. Center for Disease Control and Prevention analyzed data from 27 states and found that in 193 cases in which people were killed "due to unintentional firearm-related injuries," a "dropped gun" was to blame in only 12 of those deaths.[2]/

5.      For all the reasons set forth herein, including but not limited to SIG's failure to disclose a material safety defect with its P320, Plaintiff seeks relief in this action individually and as a purchaser of a SIG P320 pistol for: (1) violation of the Magnuson-Moss Warranty Act; (ii)

---

[1]/ The sear is the part of the trigger mechanism that holds the hammer, striker, or bolt back until the correct amount of pressure has been applied to the trigger; at which point the hammer, striker, or bolt is released to discharge the weapon.  In other words, the sear constitutes the system of levels that connects the trigger to the firing mechanism (*i.e.,* the "striker" in a SIG P320, which is similar to a firing pin in a rifle).

[2]/ Drop fires are often depicted and in media and popular culture, such as Hollywood movies.  However, these depictions are fictional.  Drop fires are not normal.

breach of express warranty; (iii) breach of the implied warranty of merchantability; (iv) unjust enrichment; (v) fraudulent concealment; (vi) fraud; and (vii) violation of the Texas Deceptive Trade Practices Act ("TDTPA"), Tex. Bus. & Com. Code §§ 17.41, *et. Seq.*

## PARTIES AND SERVICE

6.      Plaintiff **BRANDON WATSON** is a citizen of Texas, residing in Benbrook, Texas. Plaintiff Watson purchased a civilian version of the SIG P320 pistol for approximately $500.00 from the Naval Air Station, Fort Worth, Texas.  Prior to his purchase, Plaintiff Watson reviewed the portion of the SIG SAUER website concerning the P320 pistol.  Plaintiff Watson's P320 pistol is defective in that it has the original trigger and sear, and is susceptible to an unintentional drop fire.  Plaintiff Watson reasonably relied upon SIG's marketing statements about the safety of the fireman, as well as SIG's reputation for producing high-quality weapons, when he purchased his SIG P320 pistol.  When purchasing his SIG P320 pistol, Plaintiff Watson reviewed the accompanying labels, disclosures, warranties, and marketing materials, understood them as representations and warranties by SIG that the P320 was properly manufactured, free from defects, was "drop safe" and "won't fire unless you want it to."   But these representations were false. Plaintiff Watson relied on these representations and warranties in deciding to purchase his SIG P320, and these representations and warranties were not part of the basis of the bargain, in that he would not have purchased his SIG P320 if he had known that it was not, in fact, properly manufactured, free from defects, and had he known that it was susceptible to drop fires.  Plaintiff Watson also understood that in making the sale, the retailer was acting with the knowledge and approval of SIG and/or as the agent of SIG.  Plaintiff Watson also understood that each purchase involved a direct transaction between himself and SIG, because his P320 came with packaging and

other materials prepared by SIG, including representations and warranties that his P320 was properly manufactured free from defects, was "drop safe" and "won't fire unless you want it to."

7.       Defendant SIG SAUER, INC., is a Delaware corporation with its principal place of business at 72 Pease Boulevard, Portsmouth, NH 03801-6801.  SIG a leading global designer and manufacturer of firearms for military, law enforcement and commercial markets.  SIG offers pistols, rifles, short barrel rifles, firearms accessories, apparel, CD/DVD training, and knives.  The company also provides customized training in security subjects for corporate customers and law enforcement agencies on a contract basis.  SIG markets and sells its products through dealers.  SIG SAUER, INC was formerly known as SIGARMS, INC. and changed its name to SIG SAUER, INC. in October 2007.  SIG may be served through its **Registered Agent: Cogency Global, Inc., 1601 Elm Street, Suite 4360, Dallas, Texas 75201.**

## JURISDICTION AND VENUE

8.       Plaintiff seeks damages within the jurisdictional limits of this court, in the maximum amount of more than $100,000, but less than $200,000 at the time of filing this suit, which, with the passage of time, may change.

9.       This court has jurisdiction over the parties because the accident occurred in Tarrant County.

10.       Venue in Tarrant County is proper in this cause under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in this county.

## FACTS COMMON TO ALL CLAIMS

**A.     SIG Repeatedly Represents That the P320 Is "Drop Safe," "Won't Fire Unless You Want It To," and is "Originally Manufactured Free of Defects."**

11.     In its "Safety Without Compromise" marketing campaign for the P320, which appears on its website among other places, SIG represents: "We've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to:"

---

### SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

---

12.     Under the heading "Striker Safety," SIG further states that the design of the P320 "[p]revents the striker from releasing unless the trigger is pulled:"

---

**Striker Safety:** Prevents the striker from releasing unless the trigger is pulled.

---

13.     SIG further represents in the same marketing materials that the P320 is "drop safe:"

14.     How, the SIG P320 is not "drop safe" because it can discharge unintentionally when dropped.

15.     SIG also provides a "Limited Lifetime Warranty" for P320 purchases, which states SIG SAUER warrants that the enclosed firearm was originally manufactured free of defects material, workmanship and mechanical function:"

16.     However, the SIG P320 is not "manufactured free of defects" because it can discharge unintentionally when dropped.

**B.     On April 20, 2016, The U.S. Department of Defense Discovered the Drop Fire Defect, Which SIG Promptly Fixed for Military Versions of the Pistol.**

17.     In 2015, the U.S. Army sought to replace the standard-issue M9 service pistol that had been in use since 1980.  The M9, which is a Beretta 92FS chambered in 9 mm, is an older design with a steel frame and hammer-style firing mechanism.  Among the changes, the U.S. Army desired a more modern pistol with a polymer frame and a striker-style firing mechanism.

18.     As part of this effort, the U.S. Army researched several prominent brands of pistols, including the SIG P320 and the Glock 19.  The SIG P320 ultimately won the contract, worth roughly $500 million.  The full-size SIG P320 is now designated the M17 service pistol for military use, and the compact P320 is designated the M18 service pistol.

19.     During its internal testing on April 20, 2016, the U.S. Army discovered the SIG P320 pistol would fire unintentionally on its own when dropped, which the Army deemed to be a "deficiency."  The examination used a test version of ammunition, similar to a blank.  A report from the U.S. Department of Defense explains:

> During drop testing in which an empty primed cartridge was inserted, the striker struck the primer causing a discharge.  The Army directed SIG SAUER to develop ECP [an Engineering Change Proposal] to correct this deficiency.

20.     The U.S. Department of Defense traced this "deficiency" to an issue with the trigger

and sear.  Recognizing the dangerous nature of the defect, the Department of Defense required SIG to correct the issue before continuing with the M17 / M18 contract (which it did successfully):

> SIG SAUER modified the trigger mechanism to eliminate this deficiency.  Subsequent testing validated that this ECP corrected the deficiency and the pistol no longer fired when dropped.  The MHS [Modular Handgun System, code for the M17 / M18 project] with this ECP was submitted as the production-representative pistol …

21.     In a statement to CNN as part of an investigative report, the U.S. Army stated that since the fix, "there is no drop test deficiency" with the SIG P320.  This fix, however, only applied to the military versions of the SIG P320.

22.     Civilians and firearm dealers replicated the drop fire defect in their own testing of the SIG P320.  On August 7, 2017, Omaha Outdoors, an online gun store that publishes popular product reviews, published a report on YouTube exploring the issue.  Andrew Tuohy, an Iraq War veteran and firearms expert with Omaha Outdoors, tested four P320s on video for the accidental "drop fire" problem.  Three of them, when dropped at a certain angle, discharged more than half the time.[3]/  The fourth P320 had a lighter, upgraded trigger and never discharged when dropped.  Testers at Omaha Outdoors concluded the pistol's factory-installed trigger was so heavy that when the pistol was dropped on its back with the barrel facing up, the inertia of the fall caused the trigger to pull.

23.     That video prompted the Houston Police Department to conduct testing of its own.  Sgt. Robert Sandoval, the department's firearms instructor, told CNN he dropped a P320 pistol 30 times in three different ways.  It went off four times, he said.  The chief was alerted.  Officers were

---

[3]/ But even when the pistols with the older, defective trigger did not accidentally fire, there was still evidence they nearly did.  In every case, Tuohy said, he found marks on the back of the ammunition that showed the gun had tapped the primer, which ignites the gunpower.

warned immediately.

**C.    SIG Continued to Manufacture Defective Pistols for the Civilian Market Until Late 2017, of which Roughly 500,000 Defective Pistols are Still in Circulation.**

24.    Despite being aware of the defect since at least April 20, 2016, SIG did not implement the drop fire fix for its civilian pistols until late 2017, at which point it began manufacturing the P320s with a lighter trigger and modified sear.  As a result, more than 500,000 SIG P320 pistols were sold to the public with the defect.

25.    To date, SIG P320 pistols that are subject to the defect are still in widespread circulation.  In May 2018, CNN called 40 firearm dealers in 20 states as part of an investigative report, and found that 11 of the 40 shops still sold the defective version of the SIG P320 pistol.

26.    The same CNN investigative report found that 162 of the 400 SIG P320 pistols sold on Armslist.com, a leading online marketplace for guns, were of the older, defective version of the SIG P320 pistol.  CNN further found that only 4 of these sellers warned potential buyers about the problem.  Another 3 sellers displayed unrepaired guns, yet claimed they had been upgraded.

**D.    Plaintiff Brandon Watson was Shot in the Leg With a SIG SAUER P320 9 MM While at a Firing Range.**

27.    The weapon discharged without Plaintiff pulling the trigger but while Plaintiff had the gun in its holster.  When Plaintiff went to clear the gun from the holster, his right hand contacted the gun in the downward position and the weapon discharged a round into Plaintiff's right thigh on March 30, 2019.

**E.    Numerous Individuals Have Been Injured by the SIG P320's Drop Fire Defect.**

28.    There have been many prior reported incidents of unintended discharges involving

the SIG P320 that were dropped and fire unintentionally without the trigger being pulled, or simply while being handled, or while being holstered.

29.     On January 5, 2017, Officer Vincent A. Sheperis, a member of the Stamford Police Department's Special Response Team ("SRT") in Connecticut, accidentally dropped his Department-issued P320 while loading SRT equipment into the rear of his vehicle.  Upon impact with the ground, the pistol discharged, without the trigger being pulled, shooting him in his left leg, causing substantial physical harm, emotional distress, sleeplessness, and mental trauma.  At the time of its descent to the ground and the discharge, Officer Sheperis's pistol was fully holstered. The trigger was therefore incapable of being touched or of any manual movement by Officer Sheperis.  At no time before, during or after the incident did Officer Sheperis place his finger on the P320's trigger or touch the holstered firearm in any manner.  The P320 in question was delivered to SIG's headquarters for testing days after the January 5, 2017 shooting.  SIG therefore had knowledge of the accidental discharge mere days after the incident in January 2017.

30.     On October 1, 2017, Sgt. Derrick Broughton narrowly missed injuring himself in Riverdale, Georgia.  Specifically, Sgt. Broughton's SIG P320 accidentally discharged when he slipped on a cement block and fell to the ground in pursuit of a suspect.  His weapon was holstered and fire when he struck the ground.

31.     On February 7, 2018, Officer Marcie D. Vadnais, a seven-year veteran of the Loudoun County, Virginia Sheriff's Department, was removing her fully-holstered P320 from her duty belt.  In the process of removing the holster, the gun fired one round into her thigh, shattering her femur in several places and causing massive blood loss and other internal injuries.  At no time during this incident did Officer Vadnais touch the trigger, which at all times was inside and covered

by a SIG-manufactured holster.  On impact with her femur, the discharged round broke into many pieces, leaving numerous pieces of shrapnel and bone shards within her leg.  Emergency room surgeons inserted a steel rod to make it possible for Officer Vadnais to walk.  It is attached to her pelvis and knee with screws and will remain there the rest of her life.

32.     On March 29, 2018, a SWAT officer with the Orlando Police Department was injured by his personally-owned SIG P320.  The officer was at home when a call came in about a possible hostage situation.  He ran outside and accidentally dropped his holstered pistol onto his concrete driveway.  The gun went off on its own, sending a 9 mm bullet into the officer's left leg and shattering his tibia bone near the knee.

33.     Upon information and belief, it is standard operating procedure for all U.S. law enforcement agencies, including the United States Service, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, to carry pistols with a chambered round.  SIG was fully aware of this fact at the time it sold any and all P320 pistols to U.S.-based law enforcement agencies and departments.

34.     Likewise, it is widespread practice among civilians who "conceal carry" their pistols to have a round in the chamber. This practice does not violate black letter rules of firearm safety as pistols should not be susceptible to drop fire defects.

**F.     SIG's CEO Misrepresents that "There Have Been Zero Reported Drop-Related P320 Incidents."**

35.     On August 4, 2017, SIG's CEO, Ron Cohen, released a statement stating: "There have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

36.     This statement was false, in view of SIG's knowledge that Officer Sheperis had

been shot by a drop fire some eights months earlier with a version of the weapon that was not the military version, but the commercial version of the weapon. There is no difference between the version of the weapon purchased and used by law enforcement agencies and any civilians in the U.S. commercial market.

**G.      Despite its Knowledge of the Drop Fire Defect, SIG Never Issued a Mandatory Recall.**

37.     Despite being aware of the drop fire defect, Defendant SIG has not issued a mandatory recall of the commercial model of the P320 weapon.

38.     Rather, on August 8, 2017, SIG announced a "voluntary upgrade" for the P320 pistol, explaining that "[a]s a result of input from law enforcement, government and military customers, SIG has developed a number of enhancements in function, reliability, and overall safety including drop performance.

39.     The voluntary upgrade was presented as purely optional, not urgent, and not mandatory. But the so-called "voluntary upgrade" is not really an upgrade – it is a mandatory safety repair for the P320 in disguise.

40.     Nor has SIG endeavored to send individual notice to affected owners of defective SIG P320 pistols. SIG could have attempted to notify these individuals through warranty and registration records, but no such effort was made.

41.     As part of the voluntary upgrade, SIG installs a lighter trigger (by about 35%) and an improved sear to prevent accident discharges:

The voluntary upgrade also adds a disconnector safety to prevent out-of-battery discharges, in which a round is fired with the chamber open.

42.     SIG had a duty to disclose that the P320 suffered from a dangerous drop fire defect. Instead of disclosing the defect in its marketing materials or product packaging, SIG concealed this safety defect from Plaintiff Watson, causing him to purchase his pistol when he otherwise would not have purchase it.

43.     But SIG never acknowledged that its P320 suffered from a drop fire safety defect, nor did it explain that the "voluntary upgrade" was intended to repair the drop fire deficiency.

44.     Instead, SIG merely states that "[s]everal important changes have taken place to bring an original SIG SAUER P320 pistol to its new upgraded status.  These changes include an enhanced, upgraded trigger and slide."  Nothing is said about the drop fire defect, or about the crucial importance of the safety repair.

45.     Likewise, SIG prominently represents that the "updated trigger" that is offered in the "voluntary upgrade" is "expected to improve the trigger-pull experience."  Again, nothing is stated about the drop fire defect, or the critical importance of the safety repair.

46.     In an information page specifically made for "Domestic U.S. Consumer[s]," SIG explains that its upgrade program "will include an alternate design that reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector."  Yet again, SIG fails to disclose the drop fire defect, or the importance of the fix:

47.     In a 5 minute, 8 second information video posted on the SIG website, a SIG employee explains: "Okay, so you get your upgraded P320 from the box, and the first thing you're going to notice is the triggers.  The upgraded guns have a much smaller and lightweight trigger. It's been reduced in weight by about 35%.  It's going to reduce inertia to the rear."  However, the SIG employee does not explain that these changes are intended to fix the drop safety defect.

Second at 2 minutes, 20 seconds, the employee repeats that the addition of a disconnector safety has "nothing to do with the drop safety."

> So, the older style pistol, you'll notice that when the trigger is pulled, the sear will go down but also the sear would pop back up. So the trigger is actually resetting the sear in place. With the new system, since the disconnect is doing all that work for you, the trigger merely drops the sear, and that's all it does. So again, old style and new style [sic] you'll actually see that the sear simply moves down and releases the striker. The disconnector does the reset for you. So that's the big difference between the actual mechanical disconnector and the one without that. Again, nothing to do with drop safety, but it also gives you a much different feeling trigger.

In fact, the vast majority of the video discusses the disconnector safety, instead of the upgraded trigger and sear.

47.     The only information about the drop fire defect first appeared around August 8, 2017, is buried in the Frequently Asked Questions ("FAQ") on SIG's website, and itself fails to disclose material information:

> **What is the P320 Voluntary Upgrade Program?**
> SIG SAUER is offering a voluntary program for P320 pistols. This will include an alternate design that reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector.
>
> **Why is this upgrade happening?**
> Through additional testing above and beyond standard American National Standards Institute (ANSI/Sporting Arms & Ammunition Institute (SAAM), National Institute of Justice (NIJ), Department of Justice (DOJ), Massachusetts, California, and other global military and law enforcement protocols, we have confirmed that usually after multiple drops, at certain angles and conditions, a potential discharge of the firearm may result when dropped. Although it is a rare occurrence with very specific conditions, SIG SAUER is offering an upgrade to all of its current P320 owners.

48.    However, the same FAQ emphasizes that the P320 pistols are (i) "safe in its current configuration," (ii) the upgrade is a purely "voluntary service," (iii) there have been "minimal reported drop-related P320 incidents" that "occurred in conditions that appear to be outside of normal testing protocols, and (iv) the upgrade is not automatic and will not be performed if one "sends [his or her] P320 in for something other than this upgrade.

**Is my P320 safe in its current configuration?**
Yes.   The P320 meets and exceeds all US safety standards. However, mechanical safeties are designed to augment, not replace safe handling practices.   Careless and improper handling of any firearm can result in an unintentional discharge.

…

**What if I don't want to upgrade the trigger assembly on my P320?**
This is a voluntary service, as the P320 meets and exceeds all ANSI.SAAMI, NIJ, DOJ, California, Massachusetts, and safety standards.   Sig Sauer welcomes all of its P320 owners to take advantage of this program.

…

**How often has the incident described occurred?**
Minimal reported drop-related P320 incidents have occurred in the US commercial and law enforcement markets, with hundreds of thousands of guns delivered to date.   These instances occurred in conditions that appear to be outside of normal testing protocols.   The current P320 design meets and exceeds all US safety standards.   As it relates to the ad hoc media drop tests, these were not part of standardized testing protocols, and they were performed using firearms in unknown conditions.

…

**If I send my P320 in for something other than this upgrade, will the upgrade be performed automatically?**
No, the upgrade will only be performed if you elect to be part of the Voluntary Upgrade Program.

49.     In sum, SIG appears to have carefully prepared the material on its "voluntary upgrade" to conceal the drop fire defect, and the critical importance of the safety repair, which should be mandatory.  Instead, SIG represents that upgrade features "have nothing to do with drop safety," and Sig fails to adequately explain the drop fire defect.  Most significantly, the recall is not mandatory, and SIG emphasizes that "[t]his is a voluntary service."  To the extent any of these inadequate disclosures were made, Sig made them well after Plaintiff's P320 purchase.

<u>**ALLEGATIONS**</u>

<u>**COUNT I**</u>
**(Violation Of The Magnuson-Moss Warranty Act)**

50.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of his Petition.

51.     Plaintiff brings this claim against Defendant.

52.     The SIG P320 pistols are consumer products as defined in 15 U.S.C. § 2301(1).

53.     Plaintiff is a consumer as defined in 15 U.S.C. § 2301 (3).

54.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301 (4) and (5).

55.     The amount in controversy of Plaintiff's claim is more than the sum of seventy-five thousand ($75,000) dollars.

56.     In connection with the sale of the SIG P320 pistols, Defendant issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the product were "drop safe," "won't fire unless you want [them] to," and were "originally manufactured free of defects in material, workmanship and mechanical function."

57.     In fact, the SIG P320 pistols had a drop fire defect.

58.     By reason of Defendant's breach of warranties, Defendant violated the statutory rights due Plaintiff pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*, thereby damaging Plaintiff.

59.     Plaintiff was injured as a direct and proximate result of Defendant's breach because: (a) he would not have purchased the SIG P320 pistols on the same terms if they knew that the pistols have a drop fire defect; (b) the SIG P320 pistols do not have the characteristics, ingredients, uses, or benefits as promised as Defendant; and (c) Plaintiff was injured by the bump/drop defect of his SIA P320 pistol on March 30, 2019.

## COUNT II
### (Breach of Express Warranty)

60.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Petition.

61.     Plaintiff brings this claim against Defendant.

62.     Plaintiff formed a contract with Defendant at the time Plaintiff purchased the SIG P320 pistol.  The terms of the contract include the promises and affirmations of fact made by Defendant on the labeling, marketing, and advertising of the SIG P320 pistols, including that the pistols were safe for their intended uses, were "drop safe," "won't fire unless you want [them] to," and were "originally manufactured free of defects in material, workmanship and mechanical function."  This labeling, marketing, and advertising, constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiff and Defendant.

63.     Plaintiff performed all conditions precedent to Defendant's liability under this

contract when they purchased the SIG P320 pistols.

64.     Defendant breached express warranties about the SIG P320 pistols because these representations were false, as the P320 pistol is susceptible to a drop fire.

65.     Plaintiff would not have purchased his SIG P320 pistol had he known about the drop fire defect.

66.     As a result of Defendant's breaches of express warranty, Plaintiff has been damaged in the amount not only of the purchase price of the SIG P320, but also sustained physical, emotional, and economic damages associated with being shot by his defective SIG P320 pistol on March 30, 2019, and any consequential damages resulting from the purchases.

67.     DTPA Notice letter to be sent

**COUNT III**
**(Breach of the Implied Warranty of Merchantability)**

68.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Petition.

69.     Plaintiff brings this claim against Defendant.

70.     Defendant, as the designer, manufacturer, distributor, and/or seller, impliedly warranted that the SIG P320 pistols were merchantable with respect to goods of that kind.

71.     Defendant breached the warranty implied in the contract for the sale of the SIG P320 pistols because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, the goods were not fit for the ordinary purposes for which such goods are used, the goods are not adequately contained, packaged, and labeled, and the goods do not conform to the promises or affirmations of fact made

on the container and label.  As a result, Plaintiff did not receive the goods as impliedly warranted by Defendant to be merchantable.

72.     Plaintiff purchased the SIG P320 pistol in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

73.     The SIG P320 pistol was not altered by Plaintiff in a manner that would cause a drop fire defect.

74.     The SIG P320 pistol was defective when they left the exclusive control of Defendant.

75.     Defendant knew that the SIG P320 pistol would be purchased and used without additional testing by Plaintiff.

76.     The SIG P320 pistol was defectively manufactured and unfit for its intended purpose, and Plaintiff did not receive the goods as warranted.

77.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff has been injured and harmed because: (a) he would not have purchased the SIG P320 pistol on the same terms if he knew that the pistol had a drop fire defect; (b) Plaintiff was injured by the **bump**/drop fire defect of his SIG P320 pistol on March 30, 2019; and (c) the SIG P320 pistol did not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

### COUNT IV
### (Unjust Enrichment)

78.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Petition.

79.     Plaintiff brings this claim against Defendant.

80.     Plaintiff conferred a benefit in the form of monies paid to Defendant by purchasing a defective SIG P320 pistol.

81.     Defendant voluntarily accepted and retained this benefit.

82.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for a defective SIG P320 pistol, it would be unjust and inequitable for the Defendant to retain it without paying the value thereof.

**COUNT V**
**(Fraudulent Concealment)**

83.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Petition.

84.     Plaintiff brings this claim against Defendant.

85.     Defendant had a duty to disclose material facts to Plaintiff given their relationship as contracting parties and an intended user of SIG P320 pistol.  Defendant also had a duty to disclose material facts to Plaintiff namely that they were in fact manufacturing, distributing, and selling defective pistols, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

86.     Defendant possessed knowledge of these material facts.  In fact, Defendant knew about the defect since around April 20, 2016, but it continued to manufacture and sell defective pistols in the civilian market.  To date, Defendant has not issued a mandatory recall, nor does it explain the nature of the defect and the importance of the fix anywhere on its website and promotional materials.  During the time that Defendant concealed the defect, Plaintiff was unaware that his pistol had a dangerous defect.

87.     Defendant failed to discharge their duty to disclose these material facts.

88.     In so failing to disclose these material facts to Plaintiff, Defendant intended to hide from Plaintiff that he was purchasing a defective SIG P320 pistol.  As discussed above, Defendant obtained a substantial financial benefit as a result of its fraudulent concealment of the defective pistol.

89.     Plaintiff reasonably relied on Defendant's failure to disclose insofar as he would not have purchased the SIG P320 pistol had he known they were defective.

90.     As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff suffered damages in the amount of money paid for the defective SIG P320 pistol, as well as any and all damages from by the personal injury caused by the defective SIG P320.

91.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT VI
### (Fraud)

92.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Petition.

93.     Plaintiff brings this claim against Defendant.

94.     As discussed above, Defendant provided Plaintiff with false or misleading material information about the SIG P320 pistols manufactured, distributed, and sold by Defendant.  For example, SIG misrepresents that the P320 pistols are "drop safe," "won't fire unless you want [them] to," and were "originally. Manufactured free of defects in material, workmanship and mechanical function."

95.     As indicated above, however, these representations are false as the SIG P320 is defective and susceptible to a drop fire.

96.     The misrepresentations and omissions of material fact made by Defendant, upon which Plaintiff reasonably and justifiably relied, were intended to induce and actually induced Plaintiff to purchase the SIG P320 pistol.

97.     Defendant knew that the SIG P320 pistol was defective.  In fact, Defendant knew about the defect since around April 20, 2016, but it continued to manufacture and sell defective pistols in the civilian market.  To date, Defendant has not issued a mandatory recall, nor does it explain the nature of the defect and the importance of the fix anywhere on its website and promotional materials.  During the time that Defendant concealed the defect, Plaintiff was unaware that his pistol had a dangerous defect.

98.     The fraudulent actions of Defendant caused damage to Plaintiff who is entitled to damages and other legal and equitable relief as a result.

99.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## <u>COUNT VII</u>
**(Violation of The Texas Deceptive Trade Practices Act,
Tex. Bus. & Comm. Code §§ 17.41, *et seq*.**

100.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Petition.

101.     Plaintiff brings this claim against Defendant.

102.     Defendant engaged in false, misleading, and deceptive practices in violation of the which Plaintiff relied on to his detriment.

103.     By failing to disclose and actively concealing the SIG P320 pistols' drop fire defect, Defendant engaged in deceptive business practices prohibited by the Texas DTPA, including (1) representing that the SIG P320 pistols are of a particular standard, quality, and grade when they are not, and (3) failing to disclose information concerning the SIG P320 pistols with the intent to induce consumers to purchase or lease the firearms.

104.     As alleged above, Defendant made numerous statements about the safety of the SIG P320 pistols, including that they were "drop safe," "won't fire unless you want [them] to," and were "originally manufactured free of defects in material, workmanship and mechanical function." Each of these statements contributed to the deceptive context of Defendant's unlawful representations as a whole.

105.     Defendant's unfair or deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiff.

106.     In purchasing the SIG P320 pistol, Plaintiff relied on the misrepresentations and/or omissions of Defendant.  Defendant's representations turned out not to be true because the SIG P320 pistol was susceptible to a drop fire defect.  Had Plaintiff known this, he would not have purchased the SIG P320 pistol and/or paid as much for it.

107.     Defendant also breached express and implied warranties to Plaintiff, as set out above, and are, therefore liable to Plaintiff for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA.  Defendant's actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

108.     Plaintiff sustained damages as a result of Defendant's unlawful acts and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA.

Because Defendant's conduct was committed knowingly and/or intentionally, the Plaintiff is entitled to treble damages.

## DAMAGES FOR PLAINTIFF

109.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff was caused to suffer injuries and damages, and to incur the following damages:

        A.      Reasonable medical care in the past;

        B.      Reasonable and necessary medical care which will in all reasonable probability be incurred in the future;

        C.      Physical pain and suffering in the past;

        D.      Physical pain and suffering in the future;

        E.      Physical impairment in the past;

        F.      Physical impairment which, in all reasonable probability, will be suffered in the future;

        G.      Mental anguish in the past; and

        H.      Mental anguish in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

A.      For an order declaring the Defendant's conduct violates the statutes referenced herein;

B.      For an order finding in favor of Plaintiff on all counts asserted herein;

C.      For statutory, compensatory, and punitive damages in amounts to be determined by the Court and/or jury;

D.      For pre-judgment interest on all amounts awarded;

E.      For an order of restitution and all other forms of equitable monetary relief

F.      For injunctive relief as pleaded or as the Court may deem proper;

G.      For an order awarding Plaintiff his reasonable attorneys' fees and expenses and costs of suit;

H.      Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

I.      For such other and further relief as the Court may deem proper.


## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.


## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,


*/s/ Peter J. Rutter*
_____
**PETER J. RUTTER**
Texas Bar No. 00791586
E-Mail: pete@cainfirm.com
E-Service: eservice@cainfirm.com

**THE CAIN LAW FIRM, PC**
111 S. Houston Street
Granbury, Texas 76048
Telephone: (817) 573-4300
Facsimile:  (817) 573-4848

**ATTORNEYS FOR PLAINTIFF**


**TO DEFENDANT ONLY:   This is a legal document which is extremely time sensitive.
You should <u>IMMEDIATELY</u> forward a copy of this document
to your insurance agent or representative to secure coverage.**

## <u>DEFINITIONS AND INSTRUCTIONS</u>

1.      **"DOCUMENTS".**  When the word "document(s)" or "documentation" is used in these discovery requests, it means any written, typed, printed, graphic or photographic matter, or sound reproductions however produced or reproduced, including copies of computer or data processing input or output in whatever form, including electronic and magnetic data. Without limiting the generality of the foregoing, all letters, telegrams, cables, wires, notes, memoranda, accounts, ledgers, books, statements, draft s, transcripts, agreements, contracts, policies, minutes, records, diaries, journals, logs, manuals, calendars, governmental forms, computer or data processing input or output, maps, plats, moving or still pictures, diagrams, plans, drawing s, specifications, measurements, microfilm, written statements or reports, recordings, e-mail reduced to hard copy, samples or other physical objects of whatever nature now or formerly in the possession, custody or control of the party to whom these Discovery Requests are directed.

A.      The terms **"writing"** or **"written"** are intended to include, but not necessarily be limited to the following: hand writing, typewriting, computer printouts, printing, photographing, e-mail reduced to hard copy, and every other means of recording upon any tangible thing or any form of communication , including letters, words, pictures, sounds or symbols or combinations thereof; and it further includes any oral communications later reduced to writing or confirmed by a letter.

B.      Whenever the identification of documents or objects is called for in these discovery requests, the party to whom these discovery requests

are directed shall provide the date of the document, model and serial number of the object, if any, the brand of the object, name of manufacturer and date of manufacture. In lieu of identification as stated above, Defendant may produce for inspection and copying such documents or objects and/or manuals identifying such objects.

C.      With regard to documents requested to be produced, please produce the original of said documents for inspection and copying or provide complete and clear legible copies of same with immediate opportunity to review the originals.

D.      If the party to whom these interrogatories and requests are directed contends that the content of a document or the answer to an interrogatory is protected from disclosure by virtue of a privilege, or if the party objects to such discovery on any other grounds, it is intended and requested that the party shall, nevertheless, with respect to such document or answer requested, provide a description thereof, including:

(1)      A statement of the privilege or objection whereby they contend that such discovery is protected from disclosure;

(2)      Each and every fact upon which they rely to support such claim of privilege or objection;

(3)      The type of document (e.g., letter, memorandum, telegraph, telefax, note);

(4)      The date of each such document or writing;

(5)      The author of each such document or writing;

(6)      The person or persons to whom each such writing or document was directed;

(7)      The person or persons to whom each such writing or document was supplied; and

(8)      The general subject matter of each such document or writing.

2.      **"IDENTITY" "IDENTIFY" or "IDENTIFICATION":**

A.      **When used in reference to a natural person,** "identity" "identify" or "identification" means to state his or her full name and present or last known address, present employer (if employed by the party to whom this Discovery is directed, then identify the particular organization for whom he or she worked), present employer, specifying in each instance the title or position and the dates so held.

B.      **When used with respect to a document,** "identity", "identify" or "identification" means to state the date, subject and substance, author, all recipients, type of document (e.g., letter, telegraph, memorandum, computer printout, sound reproduction, chart, etc.), its present location and the identity of its present custodian. This shall include documents with respect to which a privilege is or may be claimed, if such document was, but no longer is, in your possession or subject to your control, state whether it is (1) missing or lost; (2) has been destroyed; (3) has been transferred voluntarily to others; or (4) has

been otherwise disposed of. In each such instance explain the circumstances surrounding an authorization for such disposition.

C. **When used with respect to an occasion, event, meeting or conversation,** "identity", "identify" or "identification" means to state the date, place, duration and persons attending or participating.

3. **"PERSON" or "PERSONS"** includes natural persons, including agents, servants and/or employees of this Defendant, firms, partnerships, associations, joint ventures, corporation and any other form of business organization or arrangement, as well as governmental or quasi-governmental agencies. If other than a natural person, include all natural persons associated with such entity.

4. **"YOU" or "YOUR"** means the Defendant answering the requests.

5. **"ACCIDENT," "THE INCIDENT" or "THE OCCURRENCE IN QUESTION"** means the incident made the basis of this lawsuit that occurred on or about September 19, 2019 as more fully set out in Plaintiff's Original Petition.

6. **"THIS SUIT," "THIS LAWSUIT," or "THE LAWSUIT"** shall mean the lawsuit referenced in the above-entitled and numbered cause.

In the event that your answer to any discovery request is "not applicable" or any similar phrase or answer, please explain in detail why that discovery request is not applicable.

In the event that your answer to any discovery request is "don't know" or "unknown" or any similar phrase or answer, please explain in detail all efforts made by you or your attorneys or representatives to obtain the response to that discovery request.

When a discovery request asks that you or your attorney provide information

concerning what a witness may testify about, that request is int ended to elicit a summary of any and all information that any witness may have provided to you regardless of whether they may so testify at trial.

These discovery requests should be deemed continuing in nature and you are requested to update your responses periodically to reflect any information obtained after the discovery request s are initially responded to, to include all information up to, and including, the date of trial in this action, in accordance with the Texas Rules of Civil Procedure.

Unless otherwise stated, answers to these discovery requests shall be given for the time period ending with the date answers or responses hereto are served. To the extent that such answers or responses may be enlarged, diminished or otherwise modified by information acquired or discovered by you subsequent to service of initial answers or responses, you are directed to promptly serve supplemental answers or responses reflecting such information.

You are further notified that your answers and responses to these discovery requests may be offered in evidence at the trial of this case. You are further advised that your answers or responses to these requests must be supplemented (not less than 30 days prior to the beginning of trial) when you obtain information upon the basis of which:

> (1)     You know an answer or response was incorrect when made or incomplete when made;
>
> (2)     You know that the answer or response, though correct when made, *is* no longer true and complete, and the circumstances are such that to fail to amend your answers or responses would be, in substance, misleading; or
>
> (3)     If the party expects to call an expert witness whose identity and subject

matter of such witness testimony has not been previously disclosed in response to an appropriate discovery request, such answer must be supplemented and/or amended to include the name, address and telephone number of the expert witness and the substance of the expert witness' expected testimony. This should be done as soon as practical, but in no event less than thirty (30) days prior to the beginning of trial except for good cause granted by leave of Court.

**Document Authentication.** We will assume that each document you produce is authentic. We hereby notify you that we will use each document you produce in pretrial proceedings or at trial. If you contend a document you produce to us is not authenticated, within 10 days after you produce the document, you must serve us with your specific objection to the authenticity of the document. Your objection must be either on the record or in writing and must have a good faith factual and legal basis. Your objection to the authenticity of only part of a document does not affect the authenticity of the remainder. If you make an objection, we hereby request a reasonable opportunity to establish its authenticity and to inspect the original document. TRCP 193.7 and 196.3(b).

## FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**     Please state the full name, address, telephone number, date of birth, driver's license number, social security number, and occupation of the person answering these interrogatories.

**INTERROGATORY NO. 2:**     Please state whether or not any insurer has denied coverage, or indicated that it is reserving its right to deny coverage, refuses to provide a defense, or refuses to pay all or part of any judgment, and, if so, please identify every document containing or referring to any such denial, refusal, or reservation of rights.

**INTERROGATORY NO. 3:**         List all criminal arrests and/or charges against you for theft, a crime of moral turpitude, or a felony by giving the cause number; identities of all accused; court of jurisdiction; description of criminal charges; date and place of arrest; plea made; date of trial and/or plea bargain; whether or not convicted and on what charges; time served; date of release from confinement; whether or not granted pardon or parole, and if so, date pardon granted or parole was or will be successfully completed.

**INTERROGATORY NO. 4:**         For any consulting experts whose mental impressions and opinions have been reviewed by a testifying expert, please state or provide all the discovery authorized by Rule 192.3(e) Texas Rules of Civil Procedure. A complete answer will include a list of all witness fees paid within the past five years.

**INTERROGATORY NO. 5:**         Please state completely and fully all representations, statements, declarations or admissions made by Plaintiff. Include in your answer when the communication was made, the total verbatim communication and, if that is not possible, then state the detailed substance of the communication, by whom the communication was made, where such communication took place, and all persons present when such communication was made.

**INTERROGATORY NO. 6:**         Please identify (by title, author, editor, edition, publisher, date of publication, section, portion, and page) every published treatises, periodical, or pamphlet on a subject of history, medicine, or other science or art that you may offer to use in the trial of this case under Rule 803(18) of the Texas Rules of Evidence.

**INTERROGATORY NO. 7:**         Do you contend that any personal injuries or damages sustained by any Plaintiff herein was caused by an occurrence other than the collision made the basis of this suit, such as a disease, injury or physical condition, either before or after the incidents made the basis of this case? If so, describe in detail such other occurrence, disease, injury or condition.

**INTERROGATORY NO. 8:**         Do you contend that any Plaintiff herein or a third party violated any traffic laws at the time or immediately prior to the collision? If so, describe what you contend to be the violation or give the statute number of the violation.

**INTERROGATORY NO. 9:**         If you contend that the collision in question was an "unavoidable accident," describe in detail what you believe to be the cause of the accident, to the exclusion of the conduct of any Plaintiff or Defendant.

**INTERROGATORY NO. 10:**         If you contend that the collision in question was the result of a "sudden emergency," describe in detail what you believe the sudden emergency was.

**INTERROGATORY NO. 11:**         If you contend that someone else's conduct or something else is the "sole proximate cause" of the accident in question, describe in detail the identity of that person, or what exactly caused the collision.

**INTERROGATORY NO. 12:**        Do you intend to attempt to impeach the Plaintiff herein, or any employee, agent, representative, attorney or any other natural person or business or legal entity associated in any way with or acting or purporting to act for or on behalf of any Plaintiff herein, with evidence of a criminal conviction, if any, as described in Rule 609 of the Texas Rules of Evidence?  If so, please describe in detail such evidence, giving name of accused, nature of conviction and charges on which convicted, year of conviction and whether or not parole has been successfully completed or pardon granted.

**INTERROGATORY NO. 13:**        State the Style, Court and Cause number of any lawsuit you have been a party to and the final disposition of said suit.

**INTERROGATORY NO. 14:**        Please state any and all traffic violations you have had in the five (5) years preceding this collision. Please indicate if you have had your driving license revoked due to any of these violations and the period of time your license was revoked.

**INTERROGATORY NO. 15:**        Please state whether you have had any other motor vehicle accidents in the past five (5) years. If so, please list the date and location of such accident, the parties involved and a factual description of the accident.

**INTERROGATORY NO. 16:**        Please identify the last place you had been immediately prior to the collision as well as the intended destination had the collision not occurred.  In your response please identify your reason for being at both locations, respectively.

**INTERROGATORY NO. 17:**        Please identify the first and last name of anyone you had verbal or electronic communication with within 1 hour prior to the collision, and within 1 hour after the collision.

**INTERROGATORY NO.18:**        Describe any defect that you believe, or have reason to believe, was present in the road or in the marking or signage on the road that either caused or contributed to the collision in question.

**INTERROGATORY NO. 19:**        Do you believe that the weather or a weather condition was a factor or contributed in any way to the collision in question? If so, please describe said weather or weather condition, and why you believe it was a factor or how it contributed to the collision in question.

**INTERROGATORY NO. 20:**        Where you in the course and scope of your employment at the time of the accident? If so, state the full name, telephone number, address and your immediate supervisor for your employer and indicate if you hold or held any ownership interest in this business.

**INTERROGATORY NO. 21:**        If you were injured as a result of the collision made the basis of this suit, please describe the injuries and identify where on your body you received the injuries.

## FIRST REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**  The front and back of your driver's license.

**REQUEST FOR PRODUCTION NO. 2:**  The title to the vehicle you were driving at the time of the collision made the basis of the suit.

**REQUEST FOR PRODUCTION NO. 3:**  Any and all photographs, slides, motion pictures, videotapes and other films that Defendant has of the vehicles, parties or scene in question following the collision made the basis of this suit.

**REQUEST FOR PRODUCTION NO. 4:**  All records of any type indicating that there were any mechanical or cosmetic problems or repairs concerning the vehicles involved in the collision in question during the twelve months preceding the collision.

**REQUEST FOR PRODUCTION NO. 5:**  Any and all accident or incident reports prepared in connection with the incident in question.

**REQUEST FOR PRODUCTION NO. 6:**  All exhibits Defendant will introduce at trial.

**REQUEST FOR PRODUCTION NO. 7:**  All records obtained from claims, reporting services, including but not    limited to the Southwest Index Bureau (SWIB) and Choicepoint Consumer Center (CLUE), regarding the Plaintiff.

**REQUEST FOR PRODUCTION NO. 8:**  The Defendant's claim file(s) relative to the claim made the basis of this suit, prepared and compiled up to the date this suit was filed in this Court, including but not limited to all notes, records, entries, documents, memos, correspondence, photographs, videotapes, and written information contained therein.

**REQUEST FOR PRODUCTION NO. 9:**  All documents which Defendant may use under Texas Rules of Evidence to impeach testimony given by Plaintiff or other witnesses in this case.

**REQUEST FOR PRODUCTION NO. 10:**  All documents reflecting medical reviews or audits conducted on Plaintiff's medical treatment or expenses, including correspondence between Defendant and/or his insurance company and counsel and medical review personnel.

**REQUEST FOR PRODUCTION NO. 11:**  All accident reconstruction reports prepared by or for Defendant in connection with the collision made the basis of this suit.

**REQUEST FOR PRODUCTION NO. 12:**  Any and all repair estimates concerning repairs for damages to the vehicles involved in the collision made the basis of this lawsuit.

**REQUEST FOR PRODUCTION NO. 13:**  Documentation of any property damage or personal property damage payment(s) made to Plaintiff or Defendant in connection with the collision made the basis of this suit.

**REQUEST FOR PRODUCTION NO. 14:**  Documents reflecting the disposition of any traffic citations you received in connection with the collision made the basis of this suit.

**REQUEST FOR PRODUCTION NO. 15:**  Documents sufficient to identify the charge and resolution of any of your criminal conviction for felony offenses or crimes involving moral turpitude within the past ten years.

**REQUEST FOR PRODUCTION NO. 16:**  Documents sufficient to identify and describe any corrective lenses used by you or prescribed for you at the time of the collision made the basis of this suit.

**REQUEST FOR PRODUCTION NO. 17:**  Please sign and return the attached authorization for cell phone records for the date(s) stated therein and for each cellular telephone owned or operated by you at the time of the collision made the basis of this suit.

**REQUEST FOR PRODUCTION NO. 18:**  For each consulting expert whose work product or opinions have been reviewed or relied upon by a testifying expert in this case, please produce all documents reflecting the expert's name, address and telephone number and the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, the expert's current resume and bibliography, and all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared for the consulting expert in connection with this case.

**REQUEST FOR PRODUCTION NO. 19:**  Documents sufficient to identify each claim made against Defendant in the State of Texas in the last ten years that are similar to the claims made by Plaintiff, i.e. where an individual is alleged to have been injured or damaged as a result of Defendant's negligent operation of a motor vehicle.

**REQUEST FOR PRODUCTION NO. 20:**  If Defendant was acting in the course and scope of employment with any person or entity at the time of the collision in question, all personnel records of Defendant for the ten year period preceding the incident in question through the present date including all incident and accident reports contained in Defendant's employer's files.

**REQUEST FOR PRODUCTION NO. 21:**  Copies of all procedures or manuals used in evaluation of Plaintiff's claim used by Defendant, his employees, agents, or representatives, made the basis of this lawsuit.

**REQUEST FOR PRODUCTION NO. 22:**  Produce a full and complete certified copy of all liability insurance policies issued by any insurance company in which Defendant is a named insured and/or a covered person/entity or company that were in full force at the date and/or the time of the occurrence in question.

**REQUEST FOR PRODUCTION NO. 23:**  Produce a full and complete certified declaration page for all liability insurance policies issued by any insurance company in which Defendant is a named insured and/or a covered person/entity or company that were in full force at the date and/or time of the occurrence in question.'

**REQUEST FOR PRODUCTION NO. 24:**  Produce a full and complete copy of all applications for all liability insurance policies issued by any insurance company in which Defendant is a named insured and/or a covered person/entity or company that were in full force at the date and/or the time of the occurrence in question.

**REQUEST FOR PRODUCTION NO. 25:**  Produce a full and complete certified copy of all umbrella and/or excess and/or secondary liability insurance policies issued by any insurance company in which Defendant is a named insured and/or a covered person/entity or company that were in full force at the date and/or the time of the occurrence in question.

**REQUEST FOR PRODUCTION NO. 26:**  Produce a full and complete certified declaration page for all umbrella and/or excess and/or secondary liability insurance policies issued by any insurance company in which Defendant is a named insured and/or a covered person/entity or company that were in full force at the date and/or the time of the occurrence in question.

**REQUEST FOR PRODUCTION NO. 27:**  Produce a full and complete copy of all applications for all umbrella and/or excess and/or secondary liability insurance policies issued by any insurance company in which Defendant is a named insured and/or a covered person/entity or company that were in full force at the date and/or the time of the occurrence in question.

**REQUEST FOR PRODUCTION NO. 28:**  Produce a full and complete certified copy(s) of any and all insurance agreements and/or policies, including, but not limited to, primary, umbrella, personal umbrella, excess, secondary policies (and including all endorsements, schedules and amendments) applicable to the date, incident or claims in question (regardless of whether on a claims made or occurrence basis) potentially obligating any insurance company(s) to pay a potential judgment in this case for the claims asserted against Defendant.

**REQUEST FOR PRODUCTION NO. 29:**  In the event the claims upon which the lawsuit is based are being handled by any insurance carrier under a reservation of rights, please produce a full and complete copy of all communications to and from the carriers concerning any and all such reservations.

---

**REQUEST FOR PRODUCTION NO. 30:**  In the event the pertinent policies are aggregate policies and the annual aggregates have been reduced, please produce a copy of any and all settlement documents and/or agreements relevant to the payment of such claims that have caused any reduction of such aggregates.

**REQUEST FOR PRODUCTION NO. 31:**  In the event the pertinent policies are "wasting" policies (for example, the payment by the insurance carrier of the defense attorney's fees and costs and expenses reduce the available liability policy limits), please produce a copy of any and all documents, invoices, receipts and canceled checks relevant to the payment of such defense litigation costs and expenses that have caused any reduction of such liability policy limits.

**REQUEST FOR PRODUCTION NO. 32:**  Full and complete copies of any and all documents and records concerning the Plaintiff that were obtained by and/or in the possession of Defendant from any source.

**REQUEST FOR PRODUCTION NO. 33:**  Full and complete copies of any and all medical records and information concerning the Plaintiff that were obtained by and/or in the possession of Defendant from any source.

**REQUEST FOR PRODUCTION NO. 34:**  Full and complete copies of any and all medical bills concerning the Plaintiff that were obtained by and/or in the possession of Defendant from any source.

**REQUEST FOR PRODUCTION NO. 35:**  Full and complete copies of any and all depositions on written questions including all exhibits, records and documents and things attached thereto from any person, company, entity, or source obtained by and/or in the possession of Defendant from any source concerning any issue or party or witness or potential witness in this case.

**REQUEST FOR PRODUCTION NO. 36:**  Full and complete copies of any and all employment records and documents concerning the Plaintiff that were obtained by and/or in the possession of Defendant from any source.

**REQUEST FOR PRODUCTION NO. 37:**  Full and complete copies of any and all medical information and/or records and/or documentation, including but not limited to medical records, medical expenses, x-rays or any other diagnostic test, employment records, criminal records, social security records, divorce/family law related records, educational records, unemployment records, disability records, health insurance records and/or any other insurance records or information, concerning the Plaintiff that were obtained by and/or in the possession of Defendant through deposition, deposition on written questions, subpoena, court order, authorization or any other source.

<u>**FIRST REQUESTS FOR ADMISSION**</u>

**REQUEST FOR ADMISSION NO. 1:**     Admit to the jury that you have been properly named in the above entitled and numbered cause.

**REQUEST FOR ADMISSION NO. 2:**     Admit that you have been properly served with citation in the above entitled and numbered cause.

**REQUEST FOR ADMISSION NO. 3:**     Admit that the collision made the basis of this suit was **not** the result of a sudden emergency.

**REQUEST FOR ADMISSION NO. 4:**     Admit that the collision made the basis of this suit did **not** result from an unavoidable accident.

**REQUEST FOR ADMISSION NO. 5:**     Admit that there was **no** non-human event or condition that contributed to the collision made the basis of this suit.

**REQUEST FOR ADMISSION NO. 6:**     Admit that there was **no** non-human event or condition that was the sole cause of the collision made the basis of this suit.

**REQUEST FOR ADMISSION NO. 7:**     Admit that the collision made the basis of this suit was proximately caused, at least in part, by your negligence.

**REQUEST FOR ADMISSION NO. 8:**     Admit that your negligence was the sole cause of the collision made the basis of this lawsuit.

**REQUEST FOR ADMISSION NO. 9:**     Admit that you failed to exercise ordinary care in the operation of your motor vehicle in the collision made the basis of this lawsuit.

**REQUEST FOR ADMISSION NO. 10:**     Admit that collision made the basis of this suit did not occur because of the negligence of Plaintiffs.

**REQUEST FOR ADMISSION NO. 11:**     Admit that Plaintiff did not fail to act as a person of ordinary prudence would have done under the same or similar circumstances in the collision made the basis of this suit.

**REQUEST FOR ADMISSION NO. 12:**     Admit that your vehicle struck Plaintiff's vehicle in the collision made the basis of this suit.

**REQUEST FOR ADMISSION NO. 13:**     Admit that you accept full responsibility for the collision made the basis of this suit.

## REQUESTS FOR DISCLOSURE TO DEFENDANT

Pursuant to Rule 194, you are requested to disclose within fifty (50) days of service of this request and petition herewith, the information or material described below.

a.      The correct names of the parties to this lawsuit.

b.      The names, addresses, and telephone numbers of any potential parties to this lawsuit.

c.      The legal theories, and in general, the factual basis of the responding party's claims of defenses.'

d.      The amount of any method of calculating of economic damages.

e.      The name, address and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case.

f.      For any testifying expert:

      (1)      The expert's name, address and telephone number;

      (2)      The subject matter on which the expert will testify;

      (3)      The general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information.

      (4)      If the expert is retained by, employed by or otherwise subject to the control of the responding party:

            (A)      All documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

            (B)      the expert's current resume and bibliography.

g.      Any discoverable indemnity and insuring agreements.

h.      Any discoverable settlement agreements.

i.      Any discoverable witness statements.

j.      All medical records and bills that are reasonably related to the injuries and damages asserted or in lieu thereof, an authorization permitting the disclosure of such medical records and medical bills.

k.      All medical records and medical bills obtained by the responding party by virtue of an authorization furnished by the requesting party.

l.      The name, address and telephone number of any person who may be designated as a responsible third party.